# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY DOE, individually and as next friend of Jane Doe, John Doe and Kyle Doe,<br>NANCY DOE, individually and as next friend of Jane Doe, John Doe and Kyle Doe,<br>JANE DOE, individually and as mother and next friend of John Doe and Kyle Doe,<br>JOHN DOE,<br>KYLE DOE,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security,<br>TROY A. MILLER, Acting Commissioner of U.S. Customs and Border Protection,<br>WILLIAM A. FERRARA, Executive Assistant Commissioner of CBP Office of Field Operations,<br>RAUL L. ORTIZ, Chief of U.S. Border Patrol,<br>TAE D. JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement,<br>XAVIER BECERRA, Secretary of Health andHuman Services,<br>ROCHELLE P. WALENSKY, Director of Centers for Disease Control and Prevention,<br>MERRICK GARLAND, Attorney General,<br><br>Defendants. | Civ. No.<br><br><br>**PETITION FOR A WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **Introduction**

1.        This case seeks to stop the imminent expulsion of a Haitian mother and her two, 10-year-old twin sons seeking protection from persecution and torture under U.S. and international law who are currently being summarily expelled from the United States without any chance to seek protection under U.S. law. They are being expelled (rather than "removed" with the legal protections that process affords) as part of the government's unlawful application of 42 U.S.C. § 265, a public health provision. Fulfilling its goal of shuttering the asylum system, the Trump administration seized upon the Covid-19 pandemic to claim that Title 42 gave it the unprecedented power to expel noncitizens without following U.S. immigration laws. President Biden's Administration continues to expel thousands of asylum seekers in violation of U.S. and international law under the same provision. However, as a federal district court has already ruled, Title 42 provides no such authority and its application in this manner is unlawful. It does not override immigration law, and it authorizes quarantines, not expulsions. With their Massachusetts family members, these Plaintiffs ask the Court to enjoin the application of Title 42 to them and to require the Department of Homeland Security to process their claims for protection under immigration law, 8 U.S.C. §§ 1101 *et seq*.

2.        Plaintiff Jane Doe is Haitian mother who crossed the border into the United States in Del Rio, Texas with her two sons, John Doe and Kyle Doe and who requested asylum from U.S. Customs and Border Protection ("CBP").

3.        Instead of providing the process prescribed by Title 8 (the Immigration and Nationality Act),  CBP simply placed the Plaintiffs on a bus to San Antonio, where Title 42 expulsion flights are regularly departing to Haiti.  The family's expulsion is occurring shortly after their presenting themselves to CBP today, September 22, 2021, and without any

opportunity to assert claims for protection and without the procedures required by immigration law.

4.      U.S. immigration law provides a comprehensive scheme balancing the protectionof asylum seekers—including Jane Doe and her children—with the expeditious enforcement of immigration law and the protection of national security and public health.

5.      The Immigration and Nationality Act ("INA") permits the expedited removal of noncitizens who enter the United States unlawfully and without entry documents, if, after an opportunity to be screened by an immigration judge, they are found *not* to have a "significant possibility" of establishing asylum eligibility. 8 U.S.C. § 1225(b). But noncitizens may not be sent to countries where they will face persecution, and those seeking asylum may not be removedwithout either an asylum screening for "credible fear" or a full proceeding before an immigration judge.

6.      U.S. immigration law also makes express provision for public health. It has long provided procedures for removing individuals believed to be infected with communicable diseases, and for detaining and examining noncitizens "coming from a country . . . where any of such diseases are prevalent or epidemic." 8 U.S.C. §§ 1182(a)(1)(A)(i), 1222(a).

7.      Former President Trump personally directed his administration to stop lawful asylum seekers at the southern border by any and all means. In response, in January 2019— under a program it called the "Migrant Protection Protocols" (MPP)—DHS began expelling asylum seekers into dangerous Mexican border cities to await their U.S. immigration hearings.

8.      According to reporting in the Wall Street Journal[1] and the New York Times,[2] President Trump's immigration advisor Stephen Miller recommended the "Title 42" expulsion policy as a pretext to prevent immigrants from entering the U.S. in 2019, first when an outbreak of mumps spread through immigration detention facilities in six states and again later that year when Border Patrol stations had outbreaks of the flu. On both those occasions, Mr. Miller's pretextual use of the Title 42 policy was overruled internally.

9.      However, in March 2020, Mr. Miller's pretextual Title 42 policy was adopted by the White House, which used the coronavirus pandemic as a means of augmenting this effort to end asylum at the southern border. Purporting to act under the "inspection and quarantine" provisions of 42 U.S.C. § 265, the Centers for Disease Control and Prevention ("CDC") enacted regulations and issued a sweeping order purporting to authorize not inspection and quarantine, but expulsion. Whereas migrants processed through the MPP are in removal proceedings in the United States, and can apply for asylum, migrants expelled under Title 42 are not placed in any U.S. legal proceedings. Instead, often without any paperwork, they are simply expelled into Mexico, or detained for days or weeks and then put on planes to their home countries. Title 42 expulsions are driven by immigration policy goals, not public health imperatives, and have already been found to be illegal. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), appeal pending, D.C. Cir. No. 20-5357.

10.      In subsequent litigation, the court certified a class and entered a Classwide

---

[1] *See* Michelle Hackman, Andrew Restuccia & Stephanie Armour, *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (October 3, 2020), https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601.

[2] *See* Caitlin Dickerson & Michael D. Shear, *Before Covid-19, Trump Aide Sought to Use Disease to Close Borders*, N.Y. TIMES (May 3, 2020), nytimes.com/2020/05/03/us/coronavirus-immigration-stephen-miller-public-health.html.

Preliminary Injunction of Title 42 to asylum-seeking families *See Huisha-Huisha v. Mayorkas*, 2021 U.S. Dist. LEXIS 175980 (D.D.C. September 16, 2021).  The Biden administration is appealing the injunction, the enforcement of which is stayed until September 30, 2021.

11.     While the Presidential administration has changed, unfortunately, the discriminatory treatment of Black, Indigenous and Latino asylum seekers and unlawful use Title 42 expulsion policy has not.  In images that shocked the nation and were evocative of slavery, journalists documented the deployment of CBP agents on horseback against Haitian migrants on September 19, 2021. The horrifying treatment of asylum-seeking families is the result of abusive and racially discriminatory immigration policies by the Biden administration.

12.     On September 18, 2021, the Department of Homeland Security announced a six-step "strategy to address the increase of migrants in [the Texas border city of] Del Rio" (where Plaintiffs were held) that included a "surge" of agents to "improve control of the area" and new expulsion flights to Haiti.

13.     The newly scheduled flights, which, on information and belief, are to include Plaintiffs, are the most recent in a series of expulsions the administration has carried out to Haiti, despite leaked documents showing that Homeland Security staff specifically warned that migrants and asylum seekers returned to Haiti "may face harm," including violent crime, kidnapping, political crisis and civil unrest.

14.     On September 23, 2021, Daniel Lewis Foote, the U.S. Special Envoy for Haiti, resigned in protest, saying he will "*not be associated with the United States inhumane, counterproductive decision to deport thousands of Haitian refugees*" from the US-Mexico border.

15.     As recently as May, the U.S. government recognized that political unrest and

human rights abuses had made it impossible for Haitians to safely return to their country, which prompted DHS to designate Haitians in the United States as of May for Temporary Protected Status (TPS). Under U.S. law, that status does not apply to new arrivals.

16.     Since the announcement of the six-step strategy, DHS has reportedly expelled Haitians from Del Rio on five to eight flights a day, and has interdicted people fleeing Haiti by sea. These procedures echo abusive policies in past years, when Haitian asylum seekers were interdicted and summarily returned, though eventually some were detained at the U.S. naval base in Guantanamo Bay, Cuba or on ships and screened for asylum. The Biden administration's actions violate U.S. and international law if it results in denying Haitians the right to challenge their removal to a country where they may face harm.

17.     On September 23, 2021, Plaintiffs informed their counsel that that they were being removed from the bridge at Del Rio, Texas and taken by bus to San Antonio by the government. Counsel has been unable to reach Plaintiffs since that time. Counsel for Plaintiffs contacted U.S. Customs and Border Protection Deputy Assistant Chief Counsel Eric J. Drootman at the end of and after business hours by e-mail and telephone and was ultimately informed that Plaintiffs were not in the system and the government could provide no information at that time.  *See Exhibit A*, Declaration of Amy Maldonado.

18.     On September 24, 2021, at 10:52 a.m., in response to a subsequent e-mail, U.S. Customs and Border Protection Deputy Assistant Chief Counsel Eric J. Drootman confirmed via e-mail to Counsel for Plaintiffs that Plaintiffs are in CBP custody, and that he could provide no further information regarding their processing. On information and belief, Plaintiffs' expulsion under Title 42 is imminent.

19.     Jane Doe and her children are, at this moment, in the process of being unlawfully

expelled by DHS under the CDC's Title 42 order without the legally required inquiry into whether they would face persecution. These expulsions violate immigration law, Title 42, the Administrative Procedure Act, and the Constitution, as well of the duty of the United States to avoid *refoulement*. Plaintiffs seek a writ of mandamus ordering the Defendants to provide them with the legal process to which they are entitled under Title 8, and declaratory and injunctive enjoining their expulsion and providing them the opportunity to have their requests for protection considered in accordance with the INA.

## Parties

20.      Plaintiff Mary Doe is a United States citizen and resides in Massachusetts. She brings suit on her own behalf and as next friend to her sister, Jane Doe and to her 10-year-old nephews, John Doe and Kyle Doe.[3]

21.      Plaintiff Nancy Doe is a United States citizen and resides in Massachusetts. She brings suit on her own behalf and as next friend to her aunt, Jane Doe and to her 10-year-old cousins, John Doe and Kyle Doe.[4]

22.      Plaintiff Jane Doe fled Haiti to seek asylum in the United States, and was one of thousands of Haitians forced to remain for days under the bridge in Del Rio, Texas. She is the mother of John Doe and Kyle Doe. She appears individually and as next friend to her sons John Doe and Kyle Doe, and, alternatively, by and through her sister, Mary Doe, and her niece, Nancy Doe.

---

[3]A motion for leave to proceed under pseudonym is forthcoming, pending an opportunity toconfer with the United States Attorney's Office under Local Rule 7.1.

[4] Due to the danger faced by the Plaintiffs who are in the process of expulsion from the United States and the uncertainty regarding their ability to maintain contact with counsel while outside the United States, each appears here both personally and by and through a next friend who is a family member and citizen of the United States.

23.      Plaintiff John Doe is the 10-year-old son of Jane Doe and twin brother of Kyle Doe. He appears individually and, alternatively, by and through his mother, Jane Doe, his aunt Mary Doe, and his cousin, Nancy Doe.

24.      Plaintiff Kyle Doe is the 10-year-old son of Jane Doe and twin brother of John Doe. He appears individually and, alternatively, by and through his mother, Jane Doe, his aunt Mary Doe, and his cousin, Nancy Doe.

25.      Defendant Alejandro Mayorkas is the Secretary of Homeland Security and the Cabinet-level officer responsible for the administration of U.S. immigration law, including implementing the Title 42 Process. He is sued in his official capacity.

26.      Defendant Troy A. Miller is the Acting Commissioner of U.S. Customs and Border Protection ("CBP"), the DHS component responsiblefor the initial processing of migrants at the border, including implementing the Title 42 Process. He is sued in his official capacity.

27.      Defendant William A. Ferrara is the Executive Assistant Commissioner of CBP Office of Field Operations ("OFO"), the component of CBP responsible for border security, including immigration and travel through U.S. ports of entry. Mr. Ferrara is a supervisory officialresponsible for implementing the Title 42 process at ports of entry. He is sued in his official capacity.

28.      Defendant Raul L. Ortiz is the Chief of the Border Patrol. Border Patrol is responsible for border security between ports of entry. Mr. Ortiz is a supervisory official responsible for implementing the Title 42 process between ports of entry. He is sued in his official capacity.

29.      Defendant Tae D. Johnson is the Acting Director of U.S. Immigration and

Customs Enforcement ("ICE"). ICE is the DHS component that oversees immigration detention and carries out removals, including carrying out expulsions under Title 42 involving air travel. Mr. Johnson is sued in his official capacity.

30.     Defendant Xavier Becerra is the Secretary of the Department of Health and Human Services ("HHS"), a Cabinet-level department of the U.S. Government that includes the CDC. He is sued in his official capacity.

31.     Defendant Rochelle P. Walensky is the Director of the CDC. Dr. Walensky has authority over the Title 42 Process at issue in this case. She is sued in her official capacity.

32.     Defendant Merrick Garland is the Attorney General of the United States and shares responsibility for implementing asylum and other immigration laws, including protecting noncitizens from being sent to countries where they face persecution or torture. He is sued in his official capacity.

**Jurisdiction and Venue**

33.     This Court has jurisdiction under 28 U.S.C. § 1361 (mandamus), 28 U.S.C. §§ 2201-2202 (declaratory judgment) and 28 U.S.C. § 1331 (federal question), as Plaintiffs' claims arise under the APA, 5 U.S.C. § 701 *et seq*., immigration laws, international law, and the U.S. Constitution.

34.     Venue is proper in the District of Massachusetts because Defendants are officers of the United States and Plaintiffs Mary Doe and Nancy Doe reside in this district. 28 U.S.C. § 1391.

**Facts**

35.     Plaintiffs Jane Doe and her children all fled persecution and threats in Haiti and crossed the U.S.-Mexico border to seek safety in the United States. After entering the United

States, they were apprehended, and transported to San Antonio, Texas to be processed under

Title 42, and expelled without any inquiry into their fear of persecution. The government's

conduct left the Massachusetts Plaintiffs—Mary Doe and Nancy Doe—with the financial

responsibility of supporting their relatives are being expelled under Title 42 and the knowledge

that their family members are unsafe.

## Background

36.     U.S. immigration law provides the "sole and exclusive" procedures for

admitting or removing noncitizens from the United States. 8 U.S.C. § 1229a(a)(3). Its

comprehensive scheme provides detailed procedures for considering asylum claims, preventing

the spread of disease, and, where appropriate, summarily removing noncitizens. 8 U.S.C. §§

1158, 1225, 1229a, 1231(b)(3). The INA even addresses the powers of immigration officers

during an "epidemic" and the removal of those with communicable diseases. *Id.* §§ 1182(a)(1);

1222(a).

37.     The executive branch now claims the authority to set aside each provision of

U.S.immigration law whenever it deems necessary for public health. It does so based on a few

words in an 1893 "quarantine and inspection" statute that authorizes public health officials to

"prohibit

. . . the introduction of persons" into the United States in order to prevent the

"introduction" of a communicable disease. 42 U.S.C. § 265. In an unprecedented regulation and

series of orders, the government has claimed the implied authority under this statute not only to

"expel" noncitizens whenever it sees fit, but to send noncitizens into countries where they will

be persecuted.  Nothing in the plain language of 42 U.S.C. § 265 provides the sweeping

authority to ignore the INA's specific requirements for the protection of asylum seekers.

**I.  United States law requires the government to protect asylum seekers from persecution and return to harm.**

38.    United States law protects asylum seekers like Plaintiffs. It forbids sending peopleto countries where they will be persecuted, and it provides procedures for considering the claims of those who seek safety on U.S. soil.

**A.    U.S. law makes humanitarian protection available to noncitizens who face persecution abroad.**

39.    U.S. law protects those who face persecution. Two key international agreements—the 1951 Convention Relating to the Status ofRefugees and the 1967 Protocol Relating to the Status of Refugees—arose from a commitment to protect refugees after a global failure to do so during the Holocaust and World War II. The United States acceded to the Protocol in 1968, thereby binding itself to the substantive provisions of the Convention.

40.    The principle of non-*refoulement* is at the core of these agreements. Under Article33 of the Convention, the United States may not "expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group, or political opinion." The duty of non-*refoulement* is also a *jus cogens*—that is, a universal, and obligatory norm of customary international law from which the United States cannot derogate, and which U.S. courts are bound to enforce.

41.    The United States also signed the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") in 1988, pledging not to "expel, return

. . . or extradite a person to another State where there are substantial grounds for believing that hewould be in danger of being subjected to torture."

42.     U.S. statutes and regulations implement these international commitments by creating three forms of humanitarian protection—asylum, withholding of removal, and protection under CAT.

43.     First, the INA permits a noncitizen to apply for asylum who is "physically presentin the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status" 8 U.S.C. § 1158(a)(1). To qualify for asylum, the noncitizen must show a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158. The asylum statute carves out criminal and other exceptions to eligibility but does not impose the public health exceptions that apply to other immigration benefits. *See id.* § 1158(a)(2), (b)(2); 1182(a)(1).[5]

44.     Second, withholding of removal is a nondiscretionary form of protection that mustbe granted to noncitizens who demonstrate it is more likely than not that their "life or freedom would be threatened" on account of a protected ground in the country to which they face removal, subject to certain exceptions such as for noncitizens convicted of "particularly serious crime[s]." *See* 8 C.F.R. § 208.16. This mandatory form of relief is designed to implement the U.S.'s duty of non-*refoulement*. *See* 8 U.S.C § 1231(b)(3).

45.     Third, protection under CAT is also nondiscretionary and must be granted to noncitizens who demonstrate that they are more likely than not to be tortured in the country to which they face removal. 8 C.F.R. §§ 208.16-208.18.

**B.    U.S. law creates procedures that must be followed before an asylum seeker can be removed, including the opportunity to appear before an immigration**

---

[5] Asylum is a discretionary form of protection that "may" be granted to those who satisfy itsrequirements. 8 U.S.C. § 1158(b)(1)(A).

**judge.**

46.     U.S. immigration law also sets out the specific procedures that the government must follow before noncitizens may be sent to countries in which they fear persecution, including the opportunity to see an immigration judge.

47.     The default means of removing a noncitizen from the United States is through full, formal removal proceedings before an immigration judge. *See* 8 U.S.C. § 1229a. Noncitizens placed in removal proceedings may apply for asylum, withholding of removal, and CAT protection, along with any other available defense to removal. "Unless otherwise specified" in immigration law, a § 1229a proceeding "shall be the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States." *Id.* § 1229a(a)(3).

48.     In 1996, Congress created the expedited removal process. That process providesfor the prompt removal of noncitizens who arrive at a port of entry—or who have recently entered the country illegally—without valid entry documents.[6]

49.     But even those who are subject to expedited removal are still entitled to protection from persecution and torture. Thus, noncitizens who qualify for expedited removal, but express a fear of persecution or intent to seek asylum, must be provided a fear assessment interview conducted by an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). If the officer determines that the noncitizen has a "credible fear of persecution or torture"—defined as a "significant possibility" that the noncitizen can establish eligibility for asylum or CAT relief—the noncitizen

---

[6] Expedited removal is available when noncitizens are inadmissible for one of two reasons—they lack an entry document or have committed a misrepresentation. *See* 8 U.S.C. §§ 1182(a)(6)(C), 1182(a)(7), 1225(b)(1)(A)(i). To be subject to expedited removal, a noncitizen who falls under one of these two inadmissibility grounds must be either arriving at a port of entry or must be apprehended within two years of unlawfully entering the United States. 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 84 Fed. Reg. 35,409 (July 23, 2019). Until recently, expedited removal was limited to individuals encountered within 100 air miles of a U.S. land border and within 14 days of entry. *See* 69 Fed. Reg. 48,877 (Aug. 11, 2004).

is placed in full removal proceedings before an immigration judge where these forms of relief can be considered. 8 U.S.C. § 1225(b)(1)(B)(v). A noncitizen may only be removed if at the end of the proceeding the immigration judge orders removal. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. §§ 208.30(e)–(f), 235.6.[7] If an asylum officer does not find a credible fear, the noncitizen is entitled to review by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

50.     Even in the few instances where the law does not provide for either full removal proceedings or a credible fear screening, it prohibits the removal of those who fear persecution unless there is first an inquiry into that fear. For example, where a noncitizen has been legally removed from the United States and unlawfully re-enters, the prior removal order may be reinstated. 8 U.S.C. § 1231(a)(5). But even then, a noncitizen who expresses a fear of persecution *cannot* be removed without a fear screening, including the opportunity for review by an immigration judge. 8 C.F.R. § 208.31. That screening takes place under a higher, "reasonable fear" standard, defined as a "reasonable possibility" that a noncitizen will be persecuted on account of a protected ground, or tortured, if removed to that country. *Id.* § 208.31(c). Screenings under this standard are intended to satisfy the U.S.'s non-*refoulement* obligations. 64 Fed. Reg. 8478, 8493 (Feb. 19, 1999). Noncitizens found to have a "reasonable fear" of persecution or torture are referred to an immigration judge for "withholding-only" proceedings, despite being ineligible for asylum due to the prior removal. *See* 8 C.F.R. § 208.31(e).

51.     When noncitizens express a fear of persecution or torture about a particular country, DHS cannot send them to that country without conducting an inquiry into their fear and

---

[7] Under regulations enacted by the Trump administration on December 11, 2020, an individual who passes a credible fear screening would be referred to an immigration judge for an "asylum-and-withholding-only" procedure rather than a full removal proceeding under 8 U.S.C. § 1229a.85 Fed. Reg. 80274, 80276, 80392 (Dec. 11, 2020). These regulations have been preliminarily enjoined. *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-09253, 2021 WL 75756, at *7 (N.D. Cal. Jan. 8, 2021).

providing for review of that assessment by an immigration judge.

     **C.**     **U.S. immigration law contains specific provisions to prevent the spread communicable diseases.**

    52.     The INA includes provisions governing "health-related" grounds of inadmissibility under 8 U.S.C. § 1182(a)(1). The statute renders "ineligible for visas or admission" noncitizens who have "a communicable disease of public health significance," those who have not been vaccinated against certain diseases, and those who have "physical or mental disorder[s]" that may present "a threat to the property, safety, or welfare" of themselves or others. *Id.* § 1182(a)(1)(A).

    53.     The INA also contains a detention provision that applies to certain noncitizens "arriving at ports of the United States" who may be inadmissible on the health-related grounds, or who come "from a country or have embarked at a place where any . . . diseases [of public health significance] are prevalent or epidemic." 8 U.S.C. § 1222(a). Such noncitizens may be detained "for a sufficient time to . . . subject [them] to observation and an examination," *id.*, but may not be removed without the screening for persecution or torture that is required by the immigration statutes.

    **II.**  **As a consequence of President Trump's animus, the government acted to undermine and destroy the asylum process and keep out asylum seekers at all costs.**

    54.     Despite the duty of the executive to carry out the laws of the United States under the Constitution, the Trump administration sought to undermine the laws affording protections to people seeking asylum and was especially hostile to asylum protections for people of color.

    55.     This hostility was due in substantial part to animus toward immigrants and people of color held by President Trump and others in his administration. On information and

belief, President Trump's eagerness to harm asylum seekers was driven by his view that scapegoating migrants was politically advantageous as well as to placate the anti-immigrant sentiments of his supporters.

56.     Mr. Trump's animus toward asylum seekers who came to the southern border of the U.S. seeking protection was so strong that, while President, he repeatedly voiced a desire to physically harm them. President Trump reportedly suggested electrifying the border wall, fortifying it with an alligator moat, installing spikes on top to pierce human flesh, and having soldiers shoot migrants' legs to slow them down.[8]

57.     As President, Mr. Trump asked why the United States would want more people from Haiti (the Plaintiffs' country of origin), El Salvador, and other nations he called "shithole countries," rather than people from countries like Norway,[9] which is predominantly white.

58.     This animus caused the Trump administration to seek out ways to undermine the laws that protect asylum seekers. President Trump and former USCIS head Kenneth Cuccinelli repeatedly described laws that preserve access to the asylum process as creating a "loophole"; President Trump also called asylum a "scam" and a "hoax," and argued that most asylum requests are a fraudulent ploy to enter the country illegally.[10] Indeed, President Trump repeatedlydenounced the very existence of immigration courts or due process for asylum claims, suggesting that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came from."[10]

---

[8] Michael D. Shear & Julie Hirschfeld Davis, *Shoot Migrants' Legs, Build Alligator Moat: Behind Trump's Ideas for Border*, N.Y. TIMES (Oct. 2, 2019), nytimes.com/2019/10/01/us/ politics/trump-border-wars.html.

[9] Ryan Teague Beckwith, *President Trump Called El Salvador, Haiti 'Shithole Countries':Report*, TIME (Jan. 11, 2018), time.com/5100058/donald-trump-shithole-countries/n

[10] Jake Nevins, *Seth Meyers: 'Trump's One Political Skill Is His Inability to Feel Shame'*, THE GUARDIAN (June 26, 2018), theguardian.com/culture/2018/jun/26/late-night-roundup-seth- meyers-trump-political-skill.

59.     Driven by this animus, the Trump administration implemented a series of measures aimed at destroying the asylum system through punishing and dissuading asylum seekers. One official described his strategy as "presenting aliens with multiple unsolvable dilemmas to impact their calculus for choosing to make the arduous journey to begin with."[11]

60.     The Trump administration punished asylum seekers by separating them from their children, and impeded their access to protection through an onslaught of measures including closing the ports of entry to asylum seekers, imposing new fees, limiting work authorization, reducing procedural protections, and redefining asylum eligibility through a series of regulations that created categorical bars to asylum and expanded the grounds for discretionary denials.[12]

61.     As noted above, the Trump administration long contemplated using Title 42 to keep out asylum seekers on multiple occasions well before the Covid-19 pandemic.

62.     With the emergence of Covid-19, the Trump administration seized their opportunity. The administration forced public health officials—on threat of firing—to issue orders requiring the systematic expulsion of asylum seekers at the southern border.[13] In forcing the CDC to implement the measure, the White House "overrul[ed] the agency's scientists who said there was no evidence the action would slow the coronavirus" and no valid public health

---

[11] Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Asylum Claims*, ABC NEWS (July 29, 2019), nbcnews.com/politics/immigration/stephen-miller-wants- use-border-agents-screen-migrants-cut-number-n1035831.

[12] *See* Bill Frelick, *The Trump Administration's Final Insult and Injury to Refugees*, HUMAN RIGHTS WATCH (Dec. 11, 2020), hrw.org/news/2020/12/11/trump-administrations-final-insult-and-injury-refugees; Priyanka Boghani, *A Guide to Some Major Trump Administration Immigration Policies*, PBS FRONTLINE (Oct. 22, 2019), pbs.org/wgbh/frontline/article/a-guide-to-some-major-trump-administration-immigration-policies.

[13] *See* Jason Dearen & Garance Burke, *Pence Ordered Borders Closed After CDC Experts Refused*, AP NEWS (Oct. 3, 2020), apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae.

reason to issue it.

### III. The Title 42 expulsion program dismantled protections for asylum seekers under the pretext of a public health measure.

63.     On March 20, 2020, the Trump administration announced that, as a result of the Covid-19 pandemic, the CDC would be acting under Title 42 to bar asylum seekers at the U.S. border. Under the CDC's order, DHS began turning away undocumented migrants without any legal process or asylum screening.

### A.     The Public Health Service Act's "quarantine and inspection" provisions.

64.     The CDC relied on 42 U.S.C. § 265, which generally authorizes the Surgeon General to "prohibit, in whole or in part, the introduction of persons" from countries in which a communicable disease is present, as necessary to decrease the "serious danger of the introduction of such disease into the United States." The statute provides in full:

> Whenever the Surgeon General determines that by reason of the existence of anycommunicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulationsapproved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shalldesignate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

The CDC director now exercises this authority through delegation.[14]

65.     Section 265 was enacted in its current form in 1944. It is part of a set of provisions of the Public Health Service Act ("PHSA") that define HHS's authority pertaining to

---

[14] In 1966, the Surgeon General's § 265 authority was transferred to what is now HHS. In 2001,HHS delegated this authority to the CDC. The President's functions under § 265 were assigned to the Secretary of HHS in a 2003 executive order.

"quarantine and inspection." *See* 42 U.S. Code Part G, 42 U.S.C. §§ 264-72.

66.      HHS's authority to make rules to implement these provisions of the PHSA is

described in 8 U.S.C. § 264. Section 264 authorizes the CDC director to "make and enforce such

regulations as in his judgment are necessary to prevent the introduction, transmission, or spread

of communicable disease from foreign countries into the States." 42 U.S.C. § 264(a).

67.      Section 264 of Title 42 also limits the scope of HHS's rulemaking authority to

control the spread of communicable disease. It provides, "[r]egulations prescribed under this

section shall not provide for the apprehension, detention, or conditional release of individuals

except for the purpose of preventing the introduction, transmission, or spread of such

communicable diseases." 42 U.S.C. § 264(b). Further limits on apprehension and detention

apply where an individual is moving from one state to another, as opposed to "coming into a

State or possession from a foreign country or a possession." 42 U.S.C. § 264(c)-(d). Nowhere

does the PHSA reference any authority to expel individuals out of a state or out of the United

States.

68.      The PHSA does provide for the assistance of immigration officers, again,

mentioning nothing about expulsion. Under Section 268, "[i]t shall be the duty of the customs

officers . . . to aid in the enforcement of quarantine rules and regulations..........." 42 U.S.C. §

268(b).

69.      Finally, the PHSA sets out the penalties for individuals who violate its

provisionsor any regulations issued under its authority—a fine or imprisonment for up to one

year. 42 U.S.C. § 271. The Act does not provide for expulsion or deportation as a penalty.

**B.    The CDC's regulation regarding expulsion.**

70.      On March 24, 2020, citing the authority conferred under §§ 264, 265, and other

provisions of Title 42, the CDC issued an interim final rule that purported to authorize immigration agents to expel individuals from the United States without regard for the protections and procedures provided by immigration law—including removal proceedings, asylum law and credible fear screenings. *See* 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020) (effective date Mar. 20, 2020). The final version of the rule was published on September 11, 2020. 85 Fed. Reg. 56,424 (Sept. 11, 2020) (effective date Oct. 13, 2020).

71.     These regulations enacted a new provision, 42 C.F.R. § 71.40.

72.     Paragraph (a) of the new regulation contains language similar to 42 U.S.C. § 265,providing that the CDC director "may *prohibit, in whole or in part, the introduction into the United States of persons* from designated foreign countries" if he determines that "(1) By reasonof the existence of any quarantinable communicable disease in a foreign country . . . there is *serious danger of the introduction of such quarantinable communicable disease* into the United States; and (2) This danger is so increased by the introduction of persons from such country . . . that a *suspension of the right to introduce* such persons into the United States is required in the interest of public health." 42 C.F.R. § 71.40(a) (2020) (emphasis added).

73.     In paragraph (b), the regulation adds a series of definitions that purport to grant the CDC authority to take actions not provided for in Title 42 itself, including the authority to expel noncitizens from the United States. Paragraph (b) states in relevant part:

(1)     ***Introduction into the United States*** means the movement of a person from a foreign country . . . into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease . . . even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2)     ***Prohibit, in whole or in part, the introduction into the United States of persons*** means to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or

restricting movement into the United States, or physically expelling from the United States some or all of the persons;

(3)   *Serious danger of the introduction of such quarantinable communicable disease into the United States* means the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease; . . .

(5) *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States.

8 C.F.R. § 71.40(b) (2020).

74.     The regulation also provides that, if an order suspending the introduction of persons "will be implemented in whole or in part" by CBP, "then the [CDC] Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order..........." 85 Fed. Reg. at 56,459; *see* 42 C.F.R. § 71.40(d)(2) (2020).

75.     The regulation exempts U.S. citizens and lawful permanent residents from its provisions. 42 C.F.R. § 71.40(f) (2020).

**C.     The CDC's expulsion order**

76.     On March 26, relying on its new regulatory authority, the CDC issued a 30-day order, effective March 20, 2020, "suspending the introduction" into the United States of "covered aliens." 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective date Mar. 20, 2020). The March order was extended for an additional 30 days on April 20, 2020. 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020). On May 21, 2020, the CDC extended the order indefinitely, with modifications not relevant here. 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020). On October 16, 2020, after its final regulations became effective,

the Trump administration issued a new order replacing the prior orders, effective October 13, 2020. 85 Fed.Reg. 65,806 (Oct. 16, 2020) (effective date Oct. 13, 2020).

77.    The October order, similar to those that preceded it, "suspend[s] the introduction of all covered aliens into the United States." 85 Fed. Reg. at 65,807. It defines "covered aliens" as persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions including U.S. citizens, lawful permanent residents, people arriving at a port of entry with valid travel documents, members of the armed forces, and certain others. *Id.*

78.    The order asserts that "[t]he continued suspension of the right to introduce covered aliens requires the movement of all such aliens to the country from which they entered the United States, their country of origin, or another practicable location outside the United States, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances." 85 Fed. Reg. at 65,812.

79.    Relying on 42 C.F.R. § 71.40, the CDC reiterated that the "[s]uspension of the right to introduce" covered noncitizens includes the "temporary cessation of the effect of any law ". . . pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States." 85 Fed. Reg. at 65,808 n.6. The order is effective until it is no longer deemed "necessary to protect the publichealth," with a review to occur every 30 days. 85 Fed. Reg. at 65,812.

80.    Like the regulation, the order is silent on its application to people seeking asylum,withholding of removal, or CAT protection.

22

81.     The CDC order delegates implementation of the Title 42 Process to DHS. 85 Fed. Reg. at 65,812.

**D.     DHS's Implementation of the Title 42 Process**

82.     On April 2, 2020, a CBP memorandum ("CBP Memo") describing the agency's implementation of the Title 42 Process, an effort it calls "Operation Capio," was made public.[15]

83.     Under Operation Capio, CBP officers implementing the CDC order are instructed that they are not "operating pursuant to [their] authorities under Titles 8 and 19 [immigration and customs, respectively]" at any point during Title 42 expulsions. CBP Memo at 1.

84.     To determine whether a noncitizen is "subject to the CDC Order," the CBP Memo instructs officers to use "experience" and "physical observation" to determine whether they "believe[] that it is more likely than not" that the person whom they encounter anywhere "within the area of operation of a Border Patrol station or [port of entry]" is "seeking to enter" without proper travel documents. *Id.*

85.     The memo provides that a noncitizen who is subject to the CDC order "will be transported to the nearest [port of entry] and immediately returned to Mexico or Canada, depending on their point of transit." *Id.* at 3. Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion" to their home country. *Id.*

---

[15] Internal Memo, U.S. Customs and Border Protection, *COVID-19 CAPIO* (2020), documentcloud.org/documents/6824221-COVID-19-CAPIO.html. The CBP Memo was reportedly leaked to Pro Publica, which published it on April 2, 2020. *See* Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately – Ignoring Asylum Law*, PROPUBLICA, Apr. 2, 2020, propublica.org/article/leaked-border-patrol-memo-tells-agents-to- send-migrants-back-immediately-ignoring-asylum-law. On information and belief, DHS has not otherwise made public any guidance on the implementation of Title 42.

86.     On information and belief, Mexico has agreed to allow nationals from Mexico, Guatemala, El Salvador, and Honduras to be immediately expelled into Mexico, but does not give them permission to remain there. The United States expels nationals of other countries under Title 42 by detaining them for days or weeks and flying them to their countries of origin.[16]

87.     Under the CBP Memo, an officer may process an individual who is eligible for Title 42 under the immigration law provisions of Title 8 "only for extenuating circumstances"and upon a decision by the Chief Patrol Agent. *Id.*

88.     The CBP Memo provides no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have Covid-19.

89.     Nor does it instruct on the treatment of individuals who state a claim for asylum or express a fear of persecution. The exclusive "process" available to noncitizens subject to Title 42 is the possibility of a torture screening. *Id.* at 4. But the government does not provide notice that this procedure is available, instead providing a screening only if a noncitizen being processed under Title 42 makes "an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to." *Id.* On information and belief, CBP routinely fails to offer such screening to asylum seekers expelled under Title 42, even when they express a fear of harm that amounts to torture.

90.     Public health experts have criticized the Title 42 policy because it singles out asylum seekers without any basis in public health.[17]

---

[16] The CDC order states that "DHS will continue to use repatriation flights as necessary to movecovered aliens on a space-available basis.............................." 85 Fed. Reg. at 65,812.

[17] *See* Letter from leaders of public health schools, medical schools, hospitals, and other U.S. institutions to Alex Azar, HHS Secretary, and Robert Redfield, CDC Director, (May 18, 2020) ("The rule is thus being used to target certain classes of noncitizens rather than to protect publichealth."), publichealth.columbia.edu/public-health-now/news/public-health-experts-urge-us- officials-withdraw- order-enabling-mass-expulsion-asylum-seekers; Physicians for Human Rights, Comment Letter on

### Claims for Relief

**Count 1**
**Writ of Mandamus**
**(28 U.S.C. § 1361)**

91.     The foregoing allegations are repeated and incorporated herein.

92.     As set forth above, Defendants are currently transporting Plaintiffs to San Antonio to subject them to immediate expulsion to Haiti in violation of their obligation to provide Plaintiffs with an appropriate asylum process including but not limited to a fear and torture screening pursuant to Title 8 and in violation of Defendants' mandatory, non-delegable duties of non-r*efoulement* under federal statutes and regulations and the U.S. Constitution as well as international law.

93.     Plaintiffs accordingly seek a writ of mandamus tof require the Defendants to provide them with an appropriate asylum process under Title 8.

**Count 2**
**Violation of immigration law and the APA**
**(8 U.S.C. § 1101 *et seq.*; 8 C.F.R. § 1.1 *et seq.*; international law; 5 U.S.C. § 706(2))**

94.     The foregoing allegations are repeated and incorporated herein.

95.     U.S. immigration law is a comprehensive scheme addressing the removal of noncitizens, the consideration of asylum claims, and the threat of communicable disease. It is codified in the INA and U.S. regulations, and it also includes certain mandates of international law, including the duty of non-*refoulement*.

96.     U.S. immigration law bars removing noncitizens to countries where it is more

---

Proposed Rule 42 CFR 71 (April 23, 2020), phr.org/wp-content/ uploads/2020/05/Physicians-for-Human-Rights-Public-Comment-on-Border-Closure-April-23-2020.pdf (asserting that Title 42 lacks a basis in public health).

likely than not that they will face persecution or torture, and protects the right of "[a]ny alien who is physically present . . . or who arrives in the United States" to seek asylum, with exceptions not applicable here. 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16.

97.     The INA also provides the "the sole and exclusive procedure[s]" for determining the admission or removal of noncitizens at the border. 8 U.S.C. § 1229a(a)(3). As relevant here, those procedures are a full removal proceeding before an immigration judge under 8 U.S.C. § 1229a, or an expedited removal proceeding involving the opportunity for a credible fear screening and immigration judge review, under 8 U.S.C. § 1225(b)(1).

98.     The INA's comprehensive scheme also provides "health-related" grounds for inadmissibility and a limited detention authority applicable to certain noncitizens "arriving at ports of the United States" who come "from a country or have embarked at a place where any of such diseases are prevalent or epidemic." 8 U.S.C. §§ 1182(a)(1), 1222(a). The INA permits noncitizens subject to these provisions to seek asylum.

99.     Jane Doe and her children are currently being expelled from the United States without the procedures of U.S. immigration law.

100.    The expulsions of Jane Doe and her children violate the INA and its regulations, and the duty of non-*refoulement*. The APA thus requires this Court to "compel" the legal procedures that were "unlawfully withheld" and to "hold unlawful and set aside" these expulsions, which were "not in accordance with law" and are being undertaken "without observance of procedure required by law." *See* 5 U.S.C. § 706.

**Count 3**
**Violation of Public Health Service Act and APA**
**(42 U.S.C. § 265; 5 U.S.C. § 706(2))**

101.    The foregoing allegations are repeated and incorporated herein.

102.     Although Defendants claim to be acting under Title 42 of the U.S. Code, that statute does not authorize the expulsion of noncitizens from the United States.

103.     Title 42 also does not authorize the expulsion of individuals seeing asylum in theUnited States without affording them the statutory protections afforded under the INA, or the expulsion of noncitizens into countries where they face persecution.

104.     Even if that were not the case, Title 42 cannot be read to authorize the ongoing expulsion of asylum seekers on the basis of a disease already being widely transmitted in the United States.

105.     The imminent expulsion of Jane Doe and her children under this *ultra vires* authority violates the PHSA. The APA thus requires this Court to "hold unlawful and set aside" these expulsions, which are "not in accordance with law" and "in excess of statutory . . . authority." *See* 5 U.S.C. § 706(2).

**Count 4**
**Violation of the APA – Arbitrary, Capricious, and Unlawful Agency Action**
**(5 U.S.C. § 706)**

106.     The foregoing allegations are repeated and incorporated herein.

107.     The APA requires courts to "compel agency action unlawfully withheld" and to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706.

108.     Defendants' actions unlawfully deprived plaintiffs Jane Doe and her children of the procedures required by U.S. immigration law for consideration of their potential removal and claims for protection. Defendants' actions also deprived plaintiffs of due process and the

27

equal protection of our laws.

109.    Moreover, the Title 42 process created by the CDC's 2020 regulations and orders was *ultra vires*, was designed to curtail asylum rather than protect public health, and was implemented without consideration of measures that could protect public health while maintaining mechanisms for humanitarian relief. It is arbitrary, capricious, and otherwise unlawful. *See* 5 U.S.C. § 706.

### Count 5
### Violation of Equal Protection
### (U.S. Constitution, amend. V)

110.    The foregoing allegations are repeated and incorporated herein.

111.    Plaintiffs have a right under the Fifth Amendment to the U.S. Constitution to equal protection of the laws.

112.    President Trump and others in his administration harbored racial and other animus against immigrants from Haiti, Central America and other predominantly non-white countries— including Jane Doe and her children John Doe and Kyle Doe. As a result of that animus, he directed that Central American asylum seekers be kept out and repeatedly proposed to harm them by shooting their legs or building a border wall that would impale people. His administration acted on that animus and grievously harmed asylum seekers through policies that included family separation, the MPP, and the Title 42 expulsion process.

113.    President Biden's administration has, inexplicably, chosen to continue the Title 42 expulsion policy, enforcing it against black immigrants from Haiti, Cameroon, and other countries. Most recently, the world was shocked by the treatment primarily Haitian immigrants in or near Del Rio, Texas (where Plaintiffs were held until yesterday in deplorable conditions without medicine or food) when CBP officers on horseback appeared to charging and whipping

migrants including families with children.

114.      Because a "discriminatory purpose" was "a motivating factor" for the

regulationsand orders requiring the expulsion of asylum seekers during the Covid-19 pandemic,

these expulsions violated the Equal Protection Clause. *See Village of Arlington Heights v.*

*Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977).

**Count 6**
**Violation of Procedural Due Process**
**(U.S. Constitution, amend. V)**

115.      The foregoing allegations are repeated and incorporated herein.

116.      Noncitizens in the United States are entitled to due process of law, including

adherence to the procedures provided by Congress for the fair adjudication of applications for

relief and benefits made available under the immigration laws.

117.      Plaintiffs Jane Doe and her children are currently in the process of being

expelled without any of the procedures required by law for removing noncitizens from the

United States, and without any opportunity to assert claims to relief, in violation of due process.

**PRAYER FOR RELIEF**

Plaintiffs ask that this court grant the following relief:

1.      Issue a writ of mandamus requiring Defendants to provide Plaintiffs the

appropriate legal process to them under Title 8 of the United States Code;

2.      Declare that the Title 42 Process is unlawful, and that Jane Doe, John Doe and

Kyle Doe's inclusion in the Title 42 process was and is unlawful;

3.      Enjoin defendants from applying Title 42 to Plaintiffs Jane Doe, John Doe and

Kyle Doe, and order that their claims for protection be processed in the United States in

accordance with U.S. immigration law;

4.      Order that Jane Doe, John Doe and Kyle Doe be paroled into the United States while the government considers their immigration cases;

5.      Award attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)and 5 U.S.C. § 504, if applicable; and,

6.      Order any further relief this Court deems just and proper.

Respectfully submitted this 24th day of September, 2021.

/s/ Susan B. Church
Susan B. Church
MA BBO No. 639306
929 Massachusetts Ave., Ste. 1
Cambridge, MA 02139
Tel: (617) 354-3944
Fax: (617) 868- 2520
E-mail: sbc@demissiechurch.com

Amy Maldonado*
IL Bar No. 6256961
Law Office of Amy Maldonado
333 Albert Avenue, Ste. 610
East Lansing, MI 48823
Phone: (517) 803-2870
Fax: (888) 299-3780
E-mail: amy@amaldonadolaw.com

Bridget Cambria*
PA Bar No. 205271
Aldea - The People's Justice Center
532 Walnut Street
Reading, PA 19601
Phone: (484) 877-8002
Fax: (484) 772-8003
E-mail: bridget@aldeapjc.org

*Motions for pro hac vice admission forthcoming